No. 23-20188

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

MICHEL KECK, Appellant,

v.

ARTMIX CREATIVE LEARNING CENTER, LLC, Appellee.

## APPELLANT'S OPPOSITION TO APPELLEES' MOTION FOR ATTORNEYS' FEES

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Case No. 4:21-cv-00609 — Hon. Keith P. Ellison, Presiding

Submitted by:
Michel Keck
Pro Se Appellant
5538 W 1450 N
Wheatfield, IN 46392
Email: michelkeckbauer@gmail.com
Phone: (219) 306-9474

Date: Oct. 16th, 2025

**ORAL ARGUMENT NOT REQUESTED**

# I. INTRODUCTION AND RELIEF REQUESTED

Appellees' motion for attorney's fees should not be imposed against Appellant Michel Keck. She acted in good faith, relying on the advice and direction of licensed counsel whose breaches of fiduciary duty created the fee exposure now at issue. Equity and precedent preclude holding Ms. Keck financially responsible for her attorneys' misconduct. She respectfully asks the Court to deny Appellees' motion and, in the interest of equity, restore the $102,569.72 previously paid under a judgment tainted by her counsel's unauthorized acts.

# II. FACTUAL BACKGROUND

The following narrative details how each stage—from Appellant's first contact with counsel to the unauthorized waiver of her trademark rights and the appeal solicitation—was taken in good faith reliance on licensed counsel.

Ms. Keck asked Higbee & Associates to review a case that was using her Michel Keck trademark without her authorization to sell art kits to teach others how to make derivatives of her art to ask if that was legal. Higbee advised it was both trademark and copyright infringement and could be deemed willful on both counts. Ms. Keck relied in good faith on that professional assessment and sought their assistance accordingly. She cannot be faulted for relying on her attorneys' legal assessment.

Higbee's drafted complaint cited the maximum statutory damages for willful infringement. Ms. Keck questioned why it omitted a fixed amount after agreeing a fair settlement was around $40,000. Counsel assured her this was standard practice, and Ms. Keck relied on that in good faith. The language led media to wrongly report she sought nearly $900,000 from a small children's art studio, harming her reputation.

At the start of litigation, Higbee & Associates' pleadings and filings represented to the Court, opposing counsel, and the presiding judge that the action was brought to protect Ms. Keck's federally registered trademark, U.S. Trademark Registration No. 5,287,022 for "MICHEL KECK" and her copyrights. Every participant—counsel for both sides, the Court, and the record—understood that the case was based on enforcement of that specific federal trademark. There was no ambiguity; it was the foundation of the lawsuit as framed by Higbee & Associates.

At one hearing, Judge Ellison asked Mr. Higbee whether the federal trademark issue required separate treatment or was embedded in the copyright. Mr. Higbee then grossly mischaracterized Keck's U.S. Trademark Registration No. 5,287,022, MICHEL KECK, as embedded in her copyright and, without Appellant's knowledge or authorization, told the Court no separate ruling on the federal trademark was necessary. This contradicted his prior filings, in-court statements, and his assurances that the case was brought to protect her Michel Keck trademark. As a result of this unilateral waiver, the Court issued a fair-use ruling that never addressed Keck's federal trademark rights.

Even after judgment entered against Appellant, Mr. Higbee never told her that he had abandoned the trademark claim. She remained unaware for many months.

After the fair-use ruling, Higbee, on more than one occasion, partially blamed the outcome to what he called the district court's acceptance of an "unfavorable narrative" about Ms. Keck and an "overly favorable" view of Ms. Kenneally. Such reasoning was legally and ethically deficient. Counsel had an affirmative duty to correct any false or misleading statements to the tribunal and to ensure the record accurately reflected the dispute. See Model Rules of Professional Conduct 3.3(a)(1)–(3) (candor toward the tribunal) and 1.1, 1.3 (competence and diligence).

Counsel should have corrected opposing counsel's false "small children's art studio" narrative through timely evidence or motion practice. Their failure to do so breached their duty of zealous advocacy. Higbee & Associates knew of screen captures from the Wayback Machine captures showing "Michel Keck Art Kits to Go" under an "Adult Paint Wine Parties" section—but, to Ms. Keck's knowledge, never presented them to the court.

Following that loss, the Digital Justice Foundation (DJF), through attorney Andrew Grimm, solicited Appellant's participation in an appeal by contacting Higbee & Associates rather than approaching her directly. Ryan Carreon of Higbee then emailed Appellant stating that DJF wished to appeal on her behalf, assuring her that he had worked with DJF before and that she would be "in great hands." These interactions are matters of court record.

Appellant told Grimm she could not afford the more than $100,000 already awarded against her but was willing to hear him out. Over the next few months, Keck was strongly encouraged by both Higbee & Associates and DJF to appeal Judge Ellison's ruling. They described the decision as "nefarious," "outrageous," and "ripe for appeal," stating they did not believe the appellate court would make

2

the same mistake, that a successful appeal would erase any fee obligation, and—critically—that Grimm would absolutely oppose any motion for fees if they lost. That unconditional promise was made in writing and appears in the record.

It is undisputed that Appellant never initiated the appeal. The Digital Justice Foundation (DJF) solicited her participation, and Higbee & Associates facilitated that solicitation. From that point, both firms strongly encouraged her to pursue the appeal. That documentary evidence appears in the court record and in detail in Keck's mandamus petition. She did not pursue the appeal frivolously; her attorneys built that path and urged her to follow it.

Keck eventually agreed to let DJF handle the appeal. Only afterward—when she first obtained court transcripts from Grimm—did she discover that during the hearing Mr. Higbee had told Judge Ellison he did not need to make a separate ruling on her "MICHEL KECK" federally registered trademark. She was shocked and betrayed.

She immediately texted Grimm with the transcript passages, asking how he could justify what Higbee had done. Grimm replied that he was shocked and did not know why Higbee had done it. When she asked whether her trademark could still be defended on appeal, he first said he would check, then immediately texted back that it could not—the appeals court would say the issue was waived. Keck and her husband repeatedly asked if they could explain the situation to the appellate judges and were always told, "they are going to say it has been waived" and "you can't resurrect a death in the district court at the appellate stage."

Despite this, Grimm urged her to continue. The same night Keck discovered that Higbee had abandoned her federal trademark rights without her consent, Grimm texted, "And Greg is more upset about it than you or me, but he's also confident he can STILL get it reversed." That reassurance reinforced her belief that the appellate judges would reverse the decision if she maintained good-faith reliance on counsel.

During this time, Keck and her husband repeatedly asked how Higbee could, without her consent, tell the judge no ruling was needed on an issue he had promised to defend. Grimm agreed Higbee's conduct was improper and serious enough for a malpractice claim, adding that his partner, Gregory Keenan, would testify if a firm pursued it. The topic arose several times, and Grimm even arranged a call with another firm about Higbee's unauthorized actions.

These admissions show that Grimm understood the seriousness of Higbee's conduct, yet he never disclosed it to the Fifth Circuit. His omission violated his duty of candor toward the tribunal under Model Rule of Professional Conduct 3.3(a)(1) and his duty to report professional misconduct under Rule 8.3. By concealing facts he knew could constitute malpractice, Grimm deprived the appellate court of information necessary to assess the fairness of the proceedings and allowed his predecessor's breach to persist.

Grimm also failed to inform the Fifth Circuit or opposing counsel that Keck was unaware of Higbee's breach of fiduciary duty and the abandonment of her trademark rights until after she had already authorized the Digital Justice Foundation to pursue the appeal—learning the truth only when she later reviewed the court transcripts herself. This was not an accidental omission. It violated his duty of candor under the Model Rules and perpetuated in the appellate court the same unfairness that began in the district court.

After the appeal loss, Grimm told Appellant and her husband he did not believe opposing counsel would pursue attorney's fees, reasoning that such a motion would have already been filed. Exhausted and emotionally drained, they accepted that assurance. They had already paid more than $102,000 in good faith—despite Grimm's earlier advice not to pay—believing they were complying with the law and acting to prevent further harm. That payment was made under the genuine belief they were appealing a fair-use ruling concerning her federal trademark and copyrights.

Eventually, Mr. Garcia, counsel for Appellees, demanded additional attorneys' fees exceeding $110,000, later growing even higher. The amount was more than twice what Keck had been told to expect if Grimm lost the appeal. Grimm had said Garcia estimated fees would be about $50,000.

When Grimm informed Appellant that Garcia was in fact seeking more than $110,000 in fees, she was distraught. Grimm told her Garcia would lower the demand by 20 percent if she agreed to mediation. Keck explained she could not afford any payment near that amount and that mediation would be futile, forcing her into bankruptcy and adding costs. Grimm then said he would tell Garcia she was unreachable. Appellant objected and insisted he accurately convey her position. Despite that, court filings later confirmed Grimm falsely represented to Garcia that he could not reach Appellant, even though he had spoken with both Keck and her husband. The details of these calls appear in the court record and in

4

her mandamus petition. Grimm never relayed her position truthfully to Garcia; his statement that she was unreachable was false.

The escalation of Garcia's fees was due entirely to factors outside Appellant's control. She cannot be held responsible for time opposing counsel spent addressing issues with prior counsel or for multiple district-court hearings convened by Judge Ellison in which no rulings were issued. Appellant attended every hearing in good faith expecting resolution. She spoke only to correct false statements or respond to direct questions from the Court. She neither caused nor prolonged any proceedings. She also informed Garcia that she had filed a petition for writ of mandamus based on attorney misconduct and opposed the requested fees because it would be unjust to penalize her for her attorneys' wrongdoing. The record establishes that Keck did not seek this appeal on her own initiative; it was begun through attorney solicitation and direction.

At Appellees' request, the motion for attorneys' fees was remanded to the district court—the same court that had permitted prior counsel's unauthorized abandonment of her federal trademark rights. Attorney Andrew Grimm then told Appellant he could not represent her in those proceedings because he was not admitted in that district. This shocked Appellant, as Grimm had assured her and her husband before taking the appeal that, if they lost, he would "absolutely oppose any motion for fees" on her behalf. That promise was unconditional. Appellant and her husband expressed dismay that he was now breaking it. Grimm then said he would assist her in drafting the opposition papers, claiming great expertise in defeating such motions. He told her he would give her the words to say but that he needed her to write the motion in her own words and he would have an acquaintance file it. He spoke with Keck's husband, gave him notes for initial steps, and told them to contact him for next steps. But Grimm stopped responding to their emails. With the deadline approaching and no reply, Keck filed the opposition pro se.

It was only after Keck was required to explain to the district court why she had been forced to file the opposition to fees pro se that Mr. Grimm communicated—not to Keck, but to the clerk of the district court—that he had intended to file something with the Court of Appeals to address the fee issue there. This revelation came as a complete surprise to Keck and her husband, who had never been told that such a filing was even possible. They had not been informed that a simple procedural action could have avoided months of confusion and distress. Had Grimm conveyed that information when he learned Garcia's motion for fees had

5

been remanded and taken timely action, Appellant would not have had to navigate the post-judgment proceedings alone.

At every stage, Appellant acted in good faith and relied on the guidance of licensed legal professionals. She followed Higbee & Associates' representations that the initial case was viable and legally warranted; she did not draft the original complaint, which cited the highest statutory damages, and even questioned its contents. She had no knowledge of, or consent to, Higbee's later waiver of her federal trademark rights. She did not seek appellate counsel herself; she was solicited to appeal. Nor did she control Grimm's subsequent breach of his promise to "absolutely oppose" any motion for attorney's fees on her behalf.

The entire trajectory of this matter—from the initial lawsuit through the appeal to the present fee exposure—results from counsel's breaches of fiduciary duty and professional misconduct, not any bad faith by Appellant. Each assertion is supported by documentary evidence in the record and by the materials incorporated in Appellant's Petition for Writ of Mandamus before this Court.

### III. LEGAL STANDARD AND BURDEN ON FEE MOTIONS

An award of appellate attorneys' fees in this Court is discretionary, not automatic. The movant bears the burden of proving both entitlement and reasonableness. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In copyright cases under 17 U.S.C. § 505, the Supreme Court instructs that courts must give "substantial weight to the reasonableness of the losing party's position" while considering all other equitable factors. *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 208–09 (2016).

If the Court were to find that the positions advanced were not objectively reasonable, then, under settled principles of equity, responsibility must rest with the attorneys who advised and directed those positions—not with the lay client who relied in good faith on their professional judgment. Courts have long recognized that clients should not be punished for the misconduct or misjudgment of their counsel. See *Maples v. Thomas*, 565 U.S. 266, 283 (2012) (holding that when an attorney's abandonment severs the agency relationship, the client cannot be held responsible for the default); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (a waiver of rights must be knowing, intelligent, and intentional).

Here, Appellant's reliance on counsel's repeated assurances, many of which are a part of court record, that both the district court action and the appeal were meritorious was entirely reasonable. Any finding of unreasonableness must therefore attach to the attorneys whose professional advice created and sustained that posture—not to the client who, as a layperson, lacked the legal knowledge to second-guess them.

Fees should never be imposed punitively. As *Kirtsaeng* reaffirmed, fee determinations under § 505 must "encourage the parties to litigate meritorious claims" and serve equitable—not punitive—purposes. 579 U.S. at 204–05. The purpose of fee-shifting is to reimburse prevailing parties for legitimate expenses and deter objectively unreasonable conduct, not to punish a blameless litigant for her attorneys' breaches of duty or misjudgments of law. At all times and proven through documentary evidence to support the facts, Keck was acting in good faith reliance on her attorney's advice, guidance and encouragement. Imposing additional financial hardship on a client who has already suffered harm from her attorneys' breach of fiduciary duties would contravene the equitable balance *Kirtsaeng* requires and undermine confidence in the judicial process.

Because Appellant's former counsel breached their professional duties and abandoned her federal trademark rights without her knowledge or consent, it would be fundamentally inequitable to impose fee liability on her. The Court should therefore decline to shift fees under these unique circumstances.

## IV. ARGUMENT

### A. Ms. Keck Acted in Good Faith and Relied on Counsel's Professional Assessment

**Rule of Law:**
A client is entitled to rely in good faith on the professional judgment of her licensed attorneys. When a client reasonably relies on counsel's representations, any legal misjudgments by those attorneys should not be imputed to the client for purposes of fee liability. *Walker v. City of Mesquite*, 129 F.3d 831, 833 (5th Cir. 1997); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978).

**Application:**
Ms. Keck did not independently initiate litigation. She contacted Higbee & Associates to review potential infringement of her federally registered trademark—

7

U.S. Registration No. 5,287,022 for "MICHEL KECK"—and her copyrighted works. She expressly sought a review and professional evaluation, not immediate representation. Higbee & Associates reviewed the materials and affirmatively advised that the conduct constituted both trademark and copyright infringement and that they believed it could be found to be willful on both counts. Keck was told that legal action was warranted. Relying in good faith on that legal review, Keck authorized the firm to proceed.

If this Court were to conclude that the underlying case was objectively unreasonable, that unreasonableness rests with Higbee & Associates, who performed the professional review and gave the advice that it was a viable and worthy trademark and copyright case. Ms. Keck, as a layperson, had no independent legal expertise to evaluate their conclusion and was entitled to rely on their guidance.

**Conclusion:**
Under *Walker* and *Christiansburg*, Keck's reliance on Higbee's legal advice precludes any finding of bad faith or unreasonableness attributable to her personally. Any deficiency in the underlying case rests solely with counsel.

## B. Counsel's Unauthorized Waiver of Trademark Rights Was Legally Invalid and Severed Agency

**Rule of Law:**
An attorney's conduct undertaken without the client's consent severs the principal-agent relationship, preventing attribution of the consequences to the client. *Maples v. Thomas*, 565 U.S. 266, 283 (2012). A valid waiver must be a knowing, intelligent, and voluntary relinquishment of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Any purported waiver made without the client's knowledge or authorization is legally void.

**Application:**
Throughout the district-court proceedings, Higbee & Associates expressly represented that the case sought to protect Keck's federal trademark—U.S. Reg. No. 5,287,022 for "MICHEL KECK." Yet, when questioned by the presiding judge, counsel informed the court that no separate ruling on that trademark was necessary, thereby abandoning the very right they told Keck they were in court to defend. Keck never consented to, authorized, or was informed of that waiver—before or after it occurred.

8

Under *Zerbst*, that relinquishment was void as a matter of law. This unauthorized abandonment deprived the court of any opportunity to adjudicate her federal trademark rights and fundamentally altered the posture of the case. Whether or not the outcome would ultimately have differed, the resulting judgment—and any fee exposure derived from it—cannot equitably be imputed to Ms. Keck because it arose from a void relinquishment undertaken outside the attorney–client agency relationship.

**Conclusion:**
Because the trial loss and downstream fee exposure stem from an unauthorized and legally void waiver, *Zerbst* and *Maples* foreclose any imputation of fault or financial liability to Ms. Keck.

### C. Coordinated Solicitation and Conflicts of Interest Taint the Appeal and Preclude Fee Recovery

**Rule of Law:**
Attorneys may not solicit professional employment through another lawyer or act where personal or professional interests create a significant risk of materially limiting their representation. See Model Rule 7.3(a)–(c) (prohibiting solicitation through another lawyer or intermediary and requiring that any written or electronic solicitation be clearly identified as "Advertising Material"); Model Rule 1.7(a)(2) (defining a concurrent conflict when representation is materially limited by a lawyer's personal interest); and Model Rule 8.4(a)–(c) (prohibiting assisting another's violation of the Rules or engaging in deceit). Solicitation is impermissible even by a nonprofit entity when the contact serves the lawyer's or the organization's own professional or institutional objectives rather than the client's independent choice. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978); *In re Primus*, 436 U.S. 412 (1978); ABA Formal Op. 501 (2022) ("Solicitation includes communications facilitated through another lawyer with whom the solicitor has a prior relationship."). Comment [8] to Rule 1.7 recognizes that a conflict exists whenever a lawyer's own interests create a "significant risk" of materially limiting professional judgment.

**Application:**
After the district-court ruling, attorney Andrew Grimm of the Digital Justice Foundation (DJF) contacted Higbee & Associates, Ms. Keck's counsel of record, to request an introduction regarding a potential appeal. Ryan Carreon of Higbee— who had previously worked with Grimm—facilitated that communication. In correspondence to Ms. Keck, Carreon stated that DJF wished to handle the appeal

and that she would be "in great hands," adding that Higbee & Associates gave DJF their "highest recommendation." Ms. Keck had not sought DJF's representation and responded only after receiving this referral from existing counsel.

If Grimm had wished to reach Ms. Keck properly under Rule 7.3(c), he could have contacted her directly and clearly designated any written or electronic outreach as "Advertising Material," as the Rule expressly requires. Instead, the approach was routed through prior counsel, confirming its nature as coordinated solicitation rather than independent client outreach.

This sequence constitutes indirect solicitation under Rule 7.3(b) because representation was solicited through a prior professional relationship between the lawyers. That coordination also created a significant risk, within the meaning of Rule 1.7(a)(2), that professional judgment could be influenced by personal or institutional interests associated with both firms. As clarified in *Primus*, the limited protection afforded to nonprofit outreach applies only to independent, non-coercive, client-centered advocacy undertaken directly by counsel—not to outreach facilitated through another attorney who introduces, endorses, or persuades the client on the solicitor's behalf. Those conditions were not present here.

Keck did not independently seek appeal. The opportunity and encouragement to appeal arose solely from the coordinated outreach described above. Her decision to proceed was made only after receiving repeated professional assurances that the appeal should be pursued. Accordingly, the record demonstrates that the appeal was attorney-initiated and attorney-driven, not client-initiated, placing full responsibility for its inception on the soliciting counsel.

**Conclusion:**
Because the appeal resulted from coordinated attorney contact through a prior professional relationship and under concurrent institutional interests, the conduct falls squarely within the prohibitions of Model Rules 7.3, 1.7, and 8.4, as interpreted by *Ohralik*, *Primus*, and ABA Formal Op. 501. Such circumstances compromise the independence required of counsel and render any resulting fee exposure ethically defective. Under *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), this Court retains inherent authority to deny or vacate fee claims tainted by conflicts of interest or ethically impaired representation.

## D. Appellate Counsel's Omissions and Breach of Fiduciary Duty Further Bar Fee Liability

**Rule of Law:**
Attorneys owe clients duties of loyalty, diligence, candor, and communication under Model Rules of Professional Conduct 1.1, 1.3, and 1.4. An attorney aware of professional misconduct by prior counsel has an affirmative obligation under Rule 8.3(a) to report that misconduct. When counsel fails to fulfill these duties, the client cannot be penalized for the resulting harm. *Maples v. Thomas*, 565 U.S. 266, 283 (2012); *Walker v. City of Mesquite*, 129 F.3d 831, 833 (5th Cir. 1997).

**Application:**
Attorney Andrew Grimm of the Digital Justice Foundation (DJF) was aware that Keck's prior counsel had improperly waived her trademark rights without her consent. Keck independently discovered this waiver while reviewing court transcripts and implored Grimm to bring the issue to the attention of the appellate court. Grimm responded that the appellate panel would "just say it was waived," yet admitted that attorney Higbee's conduct might amount to legal malpractice. He further advised that if Keck could retain a firm willing to pursue a malpractice action against Higbee & Associates, his partner Gregory Keenan would serve as a witness on her behalf.

Despite knowing of Higbee's misconduct, to the best of Keck's knowledge, Grimm failed to disclose the improper abandonment of her rights to the appellate court, opposing counsel, or any disciplinary authority, in direct contravention of his obligations under Rule 8.3(a). He also breached his fiduciary duty by assuring Keck before proceeding with the appeal that, if unsuccessful, he would "absolutely oppose" any motion for attorney's fees filed against her.

When that promise was tested, Grimm asserted that he could not oppose the fee motion because he was "not admitted" in the district court. That excuse is unavailing. As appellate counsel, he retained both the authority and the obligation to protect his client's interests. He could have promptly notified the appellate panel or sought *pro hac vice* admission in the district court—routine steps available to any competent attorney. Having already induced Keck's reliance through explicit assurances of advocacy, he could not later disclaim responsibility and instruct her, after the fact it is her job to urgently find new counsel.

An attorney cannot solicit a client's trust with assurances of representation and then, when action is required, abandon that commitment and declare, in effect,

11

"you're on your own." Promising advocacy to secure a client's confidence and then refusing to act when performance is due constitutes a breach of fiduciary duty, diligence, and honesty owed to both client and tribunal.

**Conclusion:**
Because appellate counsel failed to disclose known misconduct, broke explicit promises, and abandoned Keck at a critical juncture, the resulting fee exposure cannot lawfully be imposed on her. The controlling authorities bar fee liability arising from attorney dereliction.

## E. Federal Policy and Equity Compel Denial of Fees

**Rule of Law:**
Federal courts possess broad equitable discretion in determining whether to award attorney's fees, and those awards must serve the interests of justice rather than reward misconduct. See 15 U.S.C. § 1117(a); *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014); *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 208–09 (2016). *Fogerty* and *Kirtsaeng* emphasize that fee awards should encourage meritorious claims and deter frivolous ones, not punish parties who litigated in good faith. *Octane Fitness* further holds that "exceptional case" determinations turn on the totality of the circumstances, including the reasonableness of the losing party's position and the conduct of counsel.

**Application:**
The escalation of Garcia's fees is not attributable to any conduct by Appellant but to factors wholly outside her control. Appellant cannot be held responsible for time opposing counsel spent addressing disputes involving prior counsel or for multiple district-court hearings convened by Judge Ellison in which no rulings were issued and the same issues were repeatedly revisited. Appellant attended each hearing in good faith expecting a ruling and a final judgment. The only times she spoke during those proceedings were to correct false statements made about her or to respond directly to questions posed by the Court. She did not cause, request, or prolong any of those proceedings. She even informed Garcia that she had filed a petition for writ of mandamus based on attorney misconduct and that she opposed the requested fees because it is inequitable to financially penalize her for the wrongdoing of her former counsel.

Most importantly, the record establishes that Keck did not independently seek this appeal; it was initiated and advanced through attorney solicitation and direction,

not by her own choice. The Court may also take judicial notice that Appellees' counsel, Mr. Garcia, has himself submitted into the record documentary evidence identifying Higbee & Associates as a "copyright-troll" firm. This evidence—introduced by opposing counsel, not by Ms. Keck—underscores the equitable concerns raised herein and supports the conclusion that no fee award arising from such conduct would serve the interests of justice.

**Conclusion:**
Because the equities and public-policy considerations weigh decisively against shifting fees to a party who neither caused nor invited the circumstances giving rise to them, the motion for attorney's fees should be denied in its entirety. Under *Fogerty*, *Octane Fitness*, and *Kirtsaeng*, this is not an "exceptional case" warranting a fee award but rather one where equity and the purposes of the statutes compel denial.

**F. Equitable Restitution of the Prior Fee Award Is Warranted**

**Rule of Law:**
Courts possess inherent equitable authority to order restitution of amounts paid under judgments tainted by attorney misconduct, mistake, or breach of fiduciary duty. Restitution restores the parties to their status quo ante when a prior payment resulted from legal error or unauthorized action. *Atlantic Coast Line R.R. v. Florida*, 295 U.S. 301 (1935); Restatement (Third) of Restitution and Unjust Enrichment §§ 1, 37.

**Application:**
Here, the $102,569.72 payment was made pursuant to a judgment infected by counsel's unauthorized abandonment of Keck's federal trademark claim. Because that waiver occurred without her knowledge or consent, the resulting judgment—and any ensuing fee award—was legally defective. Equity therefore compels restoration of those funds. Keck was deprived of a merits adjudication through no fault of her own, and the Court's inherent authority permits it to correct that injustice by ordering restitution. Allowing retention of the prior award would conflict with principles of due process and the fiduciary duties attorneys owe clients. Any properly incurred fee liability rests with Higbee & Associates, whose breaches and unauthorized acts directly caused the judgment and payment.

**Conclusion:**
Because the prior payment arose from a judgment tainted by unauthorized attorney conduct and deprived Keck of a fair adjudication, equitable restitution is

13

warranted. The Court should exercise its inherent power to restore the $102,569.72 previously paid, returning the parties to the position they would have occupied had counsel fulfilled their professional obligations.

## G. Trademark Law Required Ms. Keck to Defend Her Federally Protected Mark

Federal law requires trademark owners to police unauthorized use of their marks or risk abandonment and loss of protection. 15 U.S.C. § 1127; *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 102 (5th Cir. 1983). Ms. Keck acted in compliance with that legal duty by seeking to prevent unlicensed commercial use of her federally registered mark. Because she acted to fulfill obligations imposed by statute, not for improper purposes, her conduct cannot be deemed frivolous or in bad faith under *Fogerty*, *Octane Fitness*, or *Kirtsaeng*. Fee shifting against her would punish the very diligence that trademark law requires.

## V. CONCLUSION & PRAYER FOR RELIEF

For all the reasons set forth above, Ms. Keck respectfully requests that this Honorable Court:

1. Deny Appellees' motion for appellate attorney's fees against Ms. Keck in full, as the record establishes that any alleged unreasonableness, waiver, or misconduct was solely the product of her attorneys' actions—conduct over which Ms. Keck had no knowledge or control;
2. Further, in the interest of equity and justice, consider vacating or refunding the $102,569.72 previously paid pursuant to the district court's judgment in a case where Ms. Keck's federally registered trademark rights were abandoned without her authorization or consent, thereby rendering the underlying judgment fundamentally unjust; and
3. Grant such other and further relief as the Court deems just, equitable, and consistent with the interests of justice.


Respectfully submitted,

/s/ **Michel Keck**

**MICHEL KECK**
Pro Se Appellant
5538 W 1450 N
Wheatfield, IN. 46392
michelkeckbauer@gmail.com
219-306-9474
Date: Oct. 16, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5,187 words, excluding the parts exempted by Rule 32(f).

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, 14-point Times New Roman font.

**/s/ Michel Keck**
Michel Keck, Pro Se
Date: Oct. 16, 2025

## CERTIFICATE OF SERVICE

I certify that on October 16, 2025, a true and correct copy of this Opposition to Appellees' Motion for Appellate Attorneys' Fees was served on all counsel of record, including Mr. Garcia (Greenberg Traurig LLP), Mr. Afrasiabi, Mr. Higbee, and Mr. Grimm via email.

Roland Garcia: garciar@gtlaw.com
Peter Afrasiabi: pafrasiabi@onellp.com
Mat Higbee: mhigbee@higbee.law
Andrew Grimm: andrew.b.grimm@gmail.com


**/s/ Michel Keck**
Michel Keck, Pro Se
5538 W 1450 N
Wheatfield, IN 46392
Email: michelkeckbauer@gmail.com
Phone: 219-306-9474
Date: Oct. 16, 2025

MICHEL KECK PRO SE PETITIONER
(2.9) 306-9474
THE UPS STORE #2169
10769 BROADWAY
CROWN POINT IN 46307-7316

SHIP
TO:
CLERK OF COURT
STE 115
600 S MAESTRI PL

NEW ORLEANS LA 70130-3440

SHP WT: 1 LBS LTR
0.8 LBS
DATE: 16 OCT 2025

UPS NEXT DAY AIR
TRACKING #: 1Z 3YR 192 01 7945 1027

LA 701 9-22

BILLING: P/P

CLERK OF COURT
600 S MAESTRI PL
STE 115
NEW ORLEANS LA 70130
P:2BOX        S: MBROWN I: 401
AR7-4000                 X
1Z3YR1920179345   1027    1030